IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CHARLES C. CURRIER, as personal
representative of the Estate of ANTHONY
MICHAEL JUAREZ, deceased, and
DEVONNE ESPERANZA JUAREZ, as
mother and next friend of LATASHA
JUAREZ, a minor,

        Plaintiffs,

v.                                                  No. CIV 97-0477 BB/JHG

TOM DORAN, in his personal capacity acting
under color of state law; SHIRLEY MEDINA,
in her personal capacity acting under color of
state law; REGINA SENTELL, in her
personal capacity acting under color of state
law; MELBA GONZALES, in her personal
capacity acting under color of state law; and
KELLY ROBBINS, in her personal capacity
acting under color of state law,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on a motion for summary judgment filed by Defendants Doran and Medina on April 16, 1998 (Doc. 28), as well as a motion for summary judgment filed by Defendants Gonzales and Robbins on April 28, 1998 (Doc. 36). Having considered the submissions of the parties and the applicable law, the Court will DENY the Doran/Medina motion, and GRANT the Gonzales/Robbins motion.

**Facts and Procedural History**

This case arises out of the tragic death of Anthony Juarez, who was three years old at the time he died. Plaintiffs' lawsuit alleges Defendants deprived Anthony[1] of his right to substantive due process by removing him from his mother's custody and allowing his father to obtain custody. Anthony's father subsequently killed him by scalding him with boiling water.

Defendants' involvement with Anthony began when Defendant Medina, acting on a report of child abuse or neglect, visited a home and found a five-year-old boy in charge of a four-year-old, a three-year-old, a two-year-old, and two three-month-old babies, with no adult present. The children were taken into state custody and, after the state filed an abuse-and-neglect petition, legal and physical custody of Anthony was given to the state in an ex parte court order. Up to that time Anthony had been in the physical and legal custody of his mother, although she had left Anthony in the "care" of another person and was living in California when the state stepped in. One week later, on May 10, 1993, the state district court held a custody hearing, gave physical custody of Anthony to his natural father, and kept legal custody with the state. Several further custody hearings were held during the summer and early autumn. During this same time period, Anthony's mother returned from California and began making accusations that Anthony was being physically abused while in his father's care.

The parties hotly dispute what occurred during the hearings held over the summer and in October. Defendants contend legal and physical custody of Anthony was given to his father in June;

---

[1] For ease of reference, this opinion refers only to Anthony, although his sister Latasha Juarez was similarly situated throughout the circumstances discussed in the opinion, and is claiming damages (through her mother) for the same causes of action asserted by Anthony's estate. All factual and legal discussions in this opinion, as well as the holding, apply equally to Latasha's claims and Anthony's claims.

Plaintiffs contend that did not happen until October 19. At this juncture, due to the procedural posture of the case, it is not necessary for the Court to decide exactly when Anthony's father was awarded both legal and physical custody.

In November, the state took temporary custody of Anthony again, after reports that bruises had been found on his body. However, three days later custody was returned to his father, because the state did not file an abuse-and-neglect petition. Over the next several months the state received other reports indicating Anthony was being abused while in his father's household, but did not act to remove Anthony. Finally, on April 14, 1994, Anthony's father poured boiling water on him, causing severe burns which ultimately resulted in his death. The father pled guilty to child abuse resulting in death and is serving an eighteen-year prison term.

Anthony's estate has filed this lawsuit seeking, among other claims, damages under 42 U.S.C. § 1983 for violation of Anthony's civil rights. The procedural posture of this case is somewhat unusual because at this point, discovery in the case has been limited to the question of whether Anthony was in the state's custody, either legal or physical, at the time he was killed. No discovery has been conducted concerning the merits of Anthony's claims. Following completion of this limited discovery, Defendants Doran and Medina have moved for summary judgment on a narrow legal issue. They maintain Anthony was in his father's custody when he was killed, and that under DeShaney they are absolved of any liability for his death as a matter of law. Defendants Gonzales and Robbins have also moved for summary judgment, raising the same argument. In addition, however, Gonzales and Robbins maintain they violated no clearly established law and are therefore entitled to qualified immunity.

**Discussion**

**A. Doran and Medina Motion**

The only question to be answered with respect to this motion is whether, as a matter of law, Defendants may not be held liable in this action simply because Anthony was not in the state's custody at the time he was killed. Discovery has revealed that beginning in October 1993, except for the brief period of state temporary custody in November, Anthony was in his father's legal as well as physical custody, and remained so until the incident that caused his death.[2] Defendants argue that this fact alone precludes any possibility they could be liable for a violation of Anthony's right to substantive due process, under the authority of DeShaney v. Winnebago County Dep't of Social Services, 489 U.S. 189 (1989). Plaintiffs, on the other hand, argue that under DeShaney, the mere fact that a child is in the custody of one of his natural parents does not automatically insulate the state from a constitutional claim arising out of the abuse of that child.

In DeShaney the Supreme Court held that generally, governmental agencies have no constitutional duty to protect a citizen from acts of violence committed by private individuals. 489 U.S. at 195-97. This is so even if the victim is a child who had previously been granted temporary protection from his parents' abuse, when the state took the child into temporary custody. Returning that child to his father's custody, to the same situation he had been in before the state acted, did not constitute a violation of the child's right to substantive due process. 489 U.S. at 201-02. The

---

[2]Plaintiffs have mentioned the existence of a custody order, entered in February 1994, which purports to order that custody of Anthony "remain" with the state. It is apparent that this order actually concerns Anthony and Latasha's half-brother, Jacob, who has a different father and who, fortunately for him, was not turned over to Anthony's father by the state. Plaintiffs do not seriously contend that this order actually applies to Anthony, and the Court therefore finds that the order does not raise a genuine issue of material fact regarding Anthony's custody situation at the time he was scalded.

4

question in this case is somewhat different, because Anthony was not originally in his father's custody. Instead, he was removed from one custody situation and placed with his father by the state. The Court finds this a significant difference from DeShaney, and one possibly (depending on the facts Plaintiffs might prove) warranting a different result.

The Tenth Circuit has recognized two exceptions to the general DeShaney rule that the state is not constitutionally liable for violence committed by private individuals. These exceptions are the special-relationship doctrine and the danger-creation theory. Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995). The special-relationship doctrine is applicable when the victim of the violence is somehow under the state's control, such as inmates of a prison or people involuntarily committed to a mental institution. Id. This doctrine also applies to children who are in the state's legal custody and have been placed in a foster home or institution. Yvonne L. v. New Mexico Dep't of Human Servs., 959 F.2d 883, 893 (10th Cir. 1992). In this case, however, the doctrine is inapplicable because Anthony was not in state custody, either legal or physical, at the time he was killed by his father. The state had relinquished all right to assert authority over Anthony (barring a new abuse or neglect petition), and had completely turned over to his father the responsibility of caring for Anthony's needs. The fact that the state had previously assumed custody of Anthony did not create a special relationship lasting beyond the time the state gave up its control over his life. See DeShaney, 489 U.S. at 201 (state does not become permanent guarantor of individual's safety by having once offered him shelter).

The other possible exception to the DeShaney rule, the danger-creation theory, applies when the state has created the danger of attack or mistreatment by private individuals, or has rendered a person more vulnerable to such conduct. Uhlrig, 64 F.3d at 572. This theory might apply to the present case based on the involvement of the state in awarding custody. Anthony was in his mother's

physical and legal custody when the state removed him from that position, took responsibility for his safety and well-being, and deposited him with his father, who had never had custody or control over Anthony and who ultimately killed him. If the state's conduct, given the information it had, was egregious enough to shock one's conscience, a viable substantive-due-process claim might be present. See Uhlrig (claim under danger-creation theory must involve state action that shocks the conscience).

Courts addressing similar situations and legal arguments have not been uniform in their response. Some courts have stated, or at least suggested, that if a natural parent or other family member has been given physical custody of a child, the state's responsibility is at an end and no civil-rights claim can result if the natural parent abuses the child. See K.H. v. Morgan, 914 F.2d 846, 852 (7th Cir. 1990) (noting there is a difference between placing a child with a member of her family and placing the child with a foster parent); Weller v. Dep't of Social Servs. for the City of Baltimore, 901 F.2d 387, 392 (4th Cir. 1990) (state had no duty to protect child from mother and grandmother, even though state had transferred custody from father to mother); cf. McComb v. Wambaugh, 934 F.2d 474, 483 (3d Cir. 1991) (no violation of equal protection where law treats children returned to parent differently than children in foster care). However, the courts writing these opinions were not directly faced with a situation in which the state, having information that the natural parent's home would be dangerous to the child, proceeded to allow that parent (who had not, to that point, had custody of the child) to take legal and physical custody of the child from the state. The only two cases the Court could locate that addressed such a situation have held that, given this fact pattern, the danger-creation exception to the DeShaney rule should be applied.

6

The facts of Ford v. Johnson, 899 F.Supp. 227 (W.D.Pa. 1995), are almost identical to the facts in this case. In Ford, a two-year-old girl was beaten to death by her natural father. She had been placed in the custody of her father after an investigation by the state, which had previously had custody of the child. The plaintiff in Ford maintained that a cause of action existed under both the special-relationship theory and the danger-creation theory. Although the district court rejected the special-relationship argument, the court held that plaintiff's danger-creation claim against the state was not barred simply because the child had been placed with a parent rather than a foster parent. 899 F.Supp. at 233. Instead, the court allowed the latter claim to proceed because the child had previously been in the custody of the state and the plaintiff alleged the state's investigation of the father, prior to allowing him to assume custody of the child, was so insufficient as to rise to the level of a constitutional violation. Id.

Similarly, in Tazioly v. City of Philadelphia, 1998 WL 633747 (E.D.Pa.), the court was faced with a situation in which the state terminated a satisfactory foster care situation and placed the child in the custody of a biological mother with known propensities for violent and bizarre behavior. The court held that under the danger-creation theory, the state might be liable under § 1983 for the resulting abuse of the child, committed by the biological mother. The Tazioly court distinguished DeShaney because the child in DeShaney had only been in the state's custody temporarily, and had been returned to the natural father because there was insufficient evidence of abuse. In Tazioly, on the other hand, the child had been in foster care, in the state's legal custody, for almost two years, and the plaintiff had alleged the state had actual knowledge the biological mother was an unfit parent and dangerous.

7

The Court finds there is a significant difference between the situation in DeShaney and the situation in this case, and agrees with the Ford and Tazioly opinions concerning the legal impact of that difference. In DeShaney, the state did not disturb the status quo. The child was in his father's custody; the state took temporary custody of the child; and the child was then returned to his father's custody. In this case, on the other hand, Anthony was removed from one custodial situation and taken into the state's care and custody. The state accordingly had a duty not to consign Anthony to another dangerous home situation. This duty is not affected by the fact that Anthony was placed with a biological parent who had not previously had custody. Once the state acts to disturb the current custodial situation and assumes control over a child's life, the state may not create a dangerous condition for the child by knowingly or recklessly turning control of the child over to an abusive person, even if that person is a parent or other family member.³ If Plaintiffs can prove Defendants had sufficient information indicating Anthony's father was dangerous, before the state relinquished custody,⁴ Plaintiffs may be able to make out a claim for violation of Anthony's right to substantive

---

³Where a party requesting custody of a child is a parent, who by law may have certain rights concerning the child's custody, there are of course countervailing factors to consider in deciding whether a constitutional violation occurred when the child was placed with that parent. See K.H., 914 F.2d at 853 (court does not want to put child welfare workers on razor's edge–damned if they return child to its family and abuse subsequently occurs, and damned if they do not do so and family sues for violation of its constitutional right to familial association). In the Court's view, however, these countervailing factors are relevant to the merits of the constitutional claim, rather than to the initial question of the existence of a duty. The Court does not accept the bright line discussed in K.H., between placement of a child with a family member and placement with someone else. In fact, it does not appear the Seventh Circuit interprets K.H. in that manner. In a later case, Judge Posner (who wrote K.H.) stated, in dictum, that if the state's employees knowingly placed the child in a position of danger, by taking her to her father's house in violation of a court order, the employees would not be shielded from liability by the DeShaney opinion. Bank of Illinois v. Over, 65 F.3d 76 (7th Cir. 1995).

⁴The Court recognizes there is a factual dispute concerning when, exactly, Anthony's father obtained both legal and physical custody over Anthony. Questions of what information Defendants

due process. See Yvonne L., 959 F.2d at 894 (standard for constitutional liability for placement of child is abdication of the duty to act professionally in making the placement). Therefore, the motion for summary judgment filed by Defendants Doran and Medina will be denied.[5]

**B. Gonzales and Robbins Motion for Summary Judgment**

As pointed out above, Defendants Gonzales and Robbins, in addition to adopting the argument made by Doran and Medina, contend they are entitled to qualified immunity. Given the limited discovery that has occurred in this case, addressing the claim of qualified immunity at this point is tantamount to addressing such a motion at the Fed.R.Civ.P. 12(b)(6) stage. Any other approach would be unfair, since Plaintiffs have not yet had an opportunity to develop facts concerning the merits of their lawsuit. When a qualified immunity defense is raised in a motion to dismiss, the plaintiff assumes the burden of showing the defendant violated clearly established law. Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997). The plaintiff must identify a clearly established statutory or constitutional right of which a reasonable person would have known, and allege facts to show the defendant's conduct violated that right. Id. In doing so, the plaintiff must meet the heightened pleading standard applicable in qualified-immunity cases. Id., 126 F.3d at 1292.

As discussed in the preceding section, Plaintiffs have established the existence of a constitutional right in this case–Anthony's right not to be placed in a dangerous home due to

---

had, and at what point in the proceedings, are relevant to the question of their liability. However, such questions are not ripe for resolution at this time, given the limited nature of the issue facing the Court.

[5]The Court notes these Defendants have argued the facts of this case do not establish a cause of action under the danger-creation doctrine. At this stage of the proceedings, the only issue before the Court is the legal issue discussed in the opinion. After Plaintiffs have had an opportunity to conduct discovery directed toward the merits of the action, the question of the existence of a valid cause of action, under the facts discovered, will be ripe for adjudication.

Defendants' abdication of their duty to act professionally in making the placement, even if the home is that of a natural parent. In addition, Plaintiffs' complaint alleges sufficient facts to establish a violation of that right, by reciting a number of alleged facts that, if proved, arguably show state action that constitutes abdication of professional duty and shocks the conscience. The only question remaining for the Court is a determination as to whether Anthony's constitutional right was clearly established at the time Defendants acted as they did. The Court holds that such a right was not so established.

In order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clear weight of authority from other courts must have found the law to be as the plaintiff maintains. Dill v. City of Edmond, ___ F.3d ___, 1998 WL 546131, *6 (10th Cir.). The law must have been clearly established at the time of the defendants' actions, rather than at the present. Id., at *16 (noting that a Tenth Circuit decision subsequent to the events that led to the lawsuit did not provide clearly established law). Defendants' actions in this case took place during 1993 and early 1994. It is therefore necessary to examine the cases applying DeShaney prior to that time, to determine whether there was clearly established law holding the state could be liable if it placed a child with a natural parent.

Both the Ford and Tazioly opinions are district court opinions, and were published and issued in 1995 and 1998, respectively. Therefore, neither opinion can serve as the basis for a finding that the law was clearly established in 1993 or 1994. In the Tenth Circuit, the Yvonne L. case was decided in 1992, which falls within the appropriate time frame. However, that case contains language indicating its scope is limited to situations in which the child remains in the state's custody and is placed in a foster home or institution. See, e.g., 959 F.2d at 891 and 893 (citing DeShaney for the

proposition that the state has no affirmative duty to protect a child who is in his parents' custody; holding that children in the custody of the state have a constitutional right to be reasonably safe from harm). In the other Circuits, as noted above, there was dicta in two 1990 cases indicating the states might be automatically free from liability if an abused child was in the custody of a parent or family member. K.H.; Weller. The DeShaney opinion itself reads quite broadly, setting out its general rule that a state is not constitutionally liable for violence committed by private individuals and then limiting that rule only with specific examples in which the child is in some way under the state's physical and legal control. In addition, DeShaney focused on the fact that the child's injuries had been caused by his natural father, who was in no sense a state actor. 489 U.S. at 189.

It is true that since DeShaney other courts have developed the danger-creation theory as an additional exception to the DeShaney rule, and one not limited to situations in which the child remains in state custody. However, as of 1993 and early 1994 this danger-creation exception to DeShaney's general rule had not been developed by the courts to the point that a reasonable state employee would recognize children had a constitutional right not to be placed with an abusive natural parent. Therefore, Defendants Gonzales and Robbins are entitled to qualified immunity in this case. See Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992) (law not clearly established where almost all cases establishing the law were decided after events forming the basis of the lawsuit). Their motion for summary judgment will be granted on this basis.

**Conclusion**

Based on the foregoing, the motion for summary judgment filed by Defendants Doran and Medina will be denied, and the motion for summary judgment filed by Defendants Gonzales and

Robbins will be granted.  Since other claims remain pending in this lawsuit, this decision does not terminate the litigation as to any Defendant.

**O R D E R**

For the above stated reasons, the Court hereby DENIES the motion for summary judgment filed by Defendants Doran and Medina (Doc. 28), and GRANTS the motion for summary judgment filed by Defendants Gonzales and Robbins (Doc. 36).

Dated at Albuquerque this 20th day of October, 1998.

_____
**BRUCE D. BLACK**
United States District Judge

Counsel for Plaintiffs:
William S. Dixon
Charles K. Purcell
Rodey, Dickason, Sloan, Akin & Robb, P.A.
P.O. Box 1888
Albuquerque, New Mexico 87103

Michael L. Stout
Stout & Winterbottom
215 West Sixth Street
Roswell, New Mexico 88201

Counsel for Defendants Doran and Medina:
Timothy V. Flynn-O'Brien
Bryan and Flynn-O'Brien
500 Copper N.W. #102
Albuquerque, New Mexico 87102

Counsel for Defendants Gonzales and Robbins:
Paula I. Forney
State of New Mexico RMD-Legal Bureau
P.O. Drawer 26110
Santa Fe, New Mexico 87502